Robert E. Mansfield (6272)
Megan E. Garrett (11650)
MITCHELL BARLOW & MANSFIELD, P.C.
Boston Building, 9 Exchange Place, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
Email: rmansfield@mbmlawyers.com
       mgarrett@mbmlawyers.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| JOHN and JANE DOE, personally and on behalf of their minor child JD,<br><br>Plaintiffs,<br><br>v.<br><br>ALPINE SCHOOL DISTRICT, SHANE FARNSWORTH, an individual, JEFF SCHOONOVER, an individual, JOHN WALLWORK, an individual, and JOSEPH ATWOOD, an individual, and DOES I-V,<br><br>Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:22-cv-00632<br><br>Judge Jill N. Parrish |

Plaintiffs John and Jane Doe (collectively the "Parents" or "Does"), personally and on behalf of their child JD, a minor, by and through their undersigned counsel, hereby oppose Defendants' Motion to Dismiss Complaint ("Motion").

**INTRODUCTION**

The Court should deny the Motion to Dismiss because Plaintiffs have sufficiently pled each of their claims. Defendants contend that Plaintiffs' claims should be dismissed because

Defendants did not impose any burden on Plaintiffs' free exercise rights; the Does have no due process right to enforce the official school attendance policies; and the Utah Governmental Immunity Act bars Plaintiffs' negligence claim.  As discussed more fully below, Defendants' contentions are without merit.  Plaintiffs have adequately alleged a prima facie case for each of their claims, and their claims should not be dismissed.

## ARGUMENT AND AUTHORITY

Plaintiffs have sufficiently pled their claims. To withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  In deciding a Rule 12(b)(6) motion, a court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  Because the "nature and specificity of the allegations required to state a plausible claim will vary based on context," a court must also "draw on its judicial experience and common sense" when evaluating a motion to dismiss for failure to state a claim. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214, 1215 (10th Cir. 2011).  Under these well-established standards, Defendants' Motion should be denied.

**I.     Plaintiffs Have Sufficiently Pleaded Facts Demonstrating That Defendants Violated The Does' Fundamental Parental Rights.**

Plaintiffs have alleged facts demonstrating that Defendants' implementation of an unofficial school schedule violated the Does' right to direct JD's upbringing.  The Does placed JD in Defendants' custody.  By dismissing students while they were supposed to be in

2

Defendants' custody, Defendants deprived the Does of the ability to manage the risk that JD would engage in pre-marital sex and otherwise direct his upbringing. Defendants' decision to abdicate their custodial responsibilities directly undermined the Does' parental rights.

The Fourteenth Amendment protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). This includes the "constitutional right to direct [a child's] education." *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist.,* 135 F.3d 694, 699 (10th Cir. 1998). "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925). For example, parents can choose whether to send their children to public or private schools. *Id.* (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)). And even in the public school setting, where schools have "publicly mandated educational and disciplinary policies," *New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985), parents "have primary rights in the upbringing of children," *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000). The state's interest in preparing students to participate in society through mandatory education must be weighed against "the traditional interest of parents with respect to the religious upbringing of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972). At the heart of this parental right is the "responsibility to inculcate 'moral standards, religious beliefs, and elements of good citizenship.'" *Gruenke*, 225 F.3d at 307 (quoting *Yoder*, 406 U.S. at 233). While the fundamental right to direct a child's education does not extend so far as to permit parents to "oust the state's authority" by controlling "each and every aspect of their children's education," *Swanson*, 135 F.3d at 699, it does encompass "actions that strike at the heart of parental

decision-making authority on matters of the greatest importance," *C.N. v. Ridewood Bd. of Educ.*, 430 F.3d 159, 184(3d Cir. 2005). Thus, parents' attempts to alter school curriculum or exempt a child from certain requirements may fail, but matters that "go[] to the heart of parenting"—such as "[t]eaching a child how to determine one's gender identity"—"rise[] to constitutional importance" and are protected by the Fourteenth Amendment. *Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-837, 2022 WL 15523185, at *17 (W.D. Pa. Oct. 27, 2022).

The Does' assertions fall well within the contours of their right to direct JD's upbringing and education. The Does are not asking for an exemption or an alteration to the curriculum. They are simply asking Defendants to comply with the official school attendance policy, the district attendance policy, and the state's statutory enactments, all of which were sent to the Does. This is distinguishable from *Swanson*, where, in the Tenth Circuit's view, the plaintiffs felt their parental right could "override the local school board's explicit decision to disallow" the policy advocated by the plaintiffs. *Swanson*, 135 F.3d at 699–700. The Court rejected the plaintiffs' challenge, concluding that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.* at 699. The Does are not attempting to "oust" Defendants' authority or "control each and every aspect" of JD's education. Instead, they simply ask that Defendants comply with Utah Code, common law *in loco parentis* principles, and their own policies regarding attendance and custody of students. Defendants' adopted attendance customs flout these authorities.

Defendants' reliance on *Parents for Privacy*, 949 F.3d 1210 (9th Cir. 2020), is misplaced. Central to the decision in *Parents for Privacy* was Ninth Circuit precedent that parental rights do not "extend beyond the threshold of the school door." *Fields v. Palmdale Sch. Dist.*, 427 F.3d

1197, 1207 (9th Cir. 2005). The Tenth Circuit has never endorsed this narrow view of parental rights. Defendants do not cite any binding caselaw supporting their position that the Does lack a due process right to have Defendants retain custody over JD when acting *in loco parentis*. Nor do Defendants find any help in *Jones v. Boulder Valley School District RE-2*, No. 20-cv-03399, 2021 WL 5264188 (D. Colo. Oct. 4, 2021). In *Jones*, the parents objected to their children's "exposure to ideas or principles that allegedly conflict with [the parents'] beliefs." *Id.* at *15. The court explained that the parents retained the ability to discuss those sensitive topics with their children and "place them in the family's moral or religious context." *Id.* at *16. As such, the exposure to "ideas which potentially are religiously offensive" did not infringe on the parents' fundamental rights to "raise, instruct, or mentor their children as they [saw] fit." *Id.* at *16, 17.

But the Does' objection here is not that JD was exposed to offensive ideas. Rather, the conduct to which the Does object is Defendants' creation of an environment where rules are allegedly in place, but which are not followed. Defendants abdicated their role as custodians of the students placed in their care without releasing those students back into their parents' care or advising the parents of this abdication. Public schools exercise "custodial and tutelary" power over their students. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995). And "for many purposes 'school authorities act *in loco parentis*.'" *Id.* (cleaned up) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986)). Under Utah's common law *in loco parentis* principles, Defendants were obligated to supervise JD while he was in their custody. "[W]hen a school district has custody of a child, it acts as a substitute for the student's parents or guardian, and has a custodial duty of protection." *Young v. Salt Lake City Sch. Dist.*, 52 P.3d 1230, 1233

5

(Utah 2002) (internal citations omitted).  "[B]y taking custody of the child, the district has 'deprived the child of the protection from his parents or guardian.  Therefore, it is properly required to give him the protection which he has lost.'"  *Id.* (cleaned up) (quoting Restatement (Second) of Torts § 320 cmt. b).  In *Young*, a child was struck by a car while walking home from school. *Id.* at 1231.  The parents sued the school district for negligence.  *Id.* at 1232.  The Utah Supreme Court concluded the school district owed no duty of care to the child, in part because classes "had adjourned for the day, and [the child] *had been released into the care of his parents*." *Id.* at 1233–34 (emphasis added).

Defendants had an obligation to supervise JD until classes adjourned *and* JD was released back into the care of the Does.  But under the adopted attendance customs, Defendants did not release students back into the custody of their parents.  Instead, Defendants created a vacuum in which JD was not in the care of Defendants or the Does.  Plaintiffs had a reasonable expectation that Defendants would supervise JD during normal school hours.  By implementing the adopted attendance customs without informing the Does, Defendants abdicated their duty to account for JD while he was in their care.  This deprived the Does of their right to make decisions about JD's upbringing for the time between Skyridge excusing students and the official scheduled end of classes for the day.

The Does are asking that Defendants comply with official policy; they are not demanding that JD be exempt from specific school instruction or policy.  Consequently, the cases cited by Defendants are inapposite. As a result of Defendants' adopted attendance customs, Defendants lost custody of JD, thereby violating the Does' fundamental right to make choices about JD's care.

## II. Plaintiffs Have Sufficiently Pleaded Facts Demonstrating That Defendants' Actions Burdened Plaintiffs' Free Exercise Of Religion.

Plaintiffs have alleged sufficient facts demonstrating that Defendants' implementation of a non-followed school schedule violated Plaintiffs' right to the free exercise of their religion. Plaintiffs took steps to limit the risk that JD would engage in pre-marital sex. But Defendants' adopted attendance customs made it impossible for Plaintiffs to meet their religious obligation to manage that risk. Because Plaintiffs had no choice but to comply with the adopted attendance customs, Defendants burdened Plaintiffs' free exercise rights. The Free Exercise Clause "prevent[s] the government from impermissibly burdening an individual's free exercise of religion." *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist.,* 135 F.3d 694, 702 (10th Cir. 1998). Accordingly, to state a free-exercise claim, a plaintiff "must show that the government has placed a burden on the exercise of his religious beliefs or practices." *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014).

"A plaintiff states a claim her exercise of religion is burdened if the challenged action is coercive or compulsory in nature." *Bauchman ex rel. Bauchman v. West High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997); *see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963) ("[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion."). That is, the rule must have some "tendency to coerce individuals into acting contrary to their religious beliefs." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988). "[T]he free exercise clause prohibits the government from coercing the individual to violate his beliefs." *Messiah Baptist Church v. Jefferson Cnty.*, 859 F.2d 820, 824 (10th Cir. 1988). A policy violates free-exercise principles if it compels conduct that is contrary to an individual's religious beliefs. *Swanson*,

7

135 F.3d at 698–99; *see also Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1069 (6th Cir. 1987) (a Free Exercise challenge requires "governmental compulsion to engage in conduct that violate[s] the plaintiffs' religious convictions").

A rule is coercive when an individual is "put to a choice between fidelity to religious belief" or compliance with the rule. *See Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717 (1981). For example, in *Bauchman*, a Jewish high school student alleged the school choir program violated her free exercise rights by requiring her to perform Christian music with the choir. 132 F.3d at 556. The choir director, however, had given the student the option not to participate in songs she found religiously offensive. *Id.* at 557. The Tenth Circuit concluded the student's ability to choose "whether or not to sing songs she believed infringed upon her exercise of religious freedom" without suffering any negative impact on her grades "negate[d] the element of coercion" required for a free exercise claim. *Id.* By contrast, in *Janny v. Gamez*, 8 F.4th 883, 894, 911 (10th Cir. 2021), an atheist parolee was directed to take part in "Christian worship services and bible study" at a local community center as a condition of his parole. If the parolee refused to participate, he would be sent to jail. *Id.* at 896. The Tenth Circuit readily found the challenged action was coercive. *Id.* at 912. Because the parolee effectively had no choice but to participate in religious programming that was contrary to his beliefs, his free exercise rights were "indisputably burdened." *Id.*

Here, Defendants' adopted attendance customs burdened Plaintiffs' right to exercise their religious beliefs. Plaintiffs effectively had no choice but to follow the adopted attendance customs, leaving JD without supervision, contrary to Plaintiffs' religious beliefs. The Does had a religious obligation to raise JD in accordance with their belief in a doctrine forbidding pre-

marital sex. As alleged in the Complaint, the Does took steps to limit JD's ability to engage in pre-marital sex by ensuring JD was not left unsupervised with his girlfriend. Complaint, ¶ 41. This included requiring JD to "travel to and from school with his older sibling" and to "be accompanied by other persons when he was with his girlfriend." *Id.* During normal school hours, while JD was in Defendants' custody, the Does did not impose additional parameters on JD's activity because Defendants' official policies required Defendants to monitor JD's school attendance. *See id.* ¶¶ 56–60.

But under Defendants' adopted attendance customs, and in violation of their policies, during the last week of the school term students were "excused and left unsupervised" after only two hours of school. *Id.* ¶ 30. Defendants did not communicate this unofficial school schedule to parents in the district. *Id.* ¶ 44. As a result, the Does had no ability to manage the risk that JD would engage in pre-marital sex—despite their religious obligation to do precisely that. Defendants interfered with the Does' ability to freely exercise their religion by meeting their religious obligation to direct the practice of JD's religion. In fact, Defendants made it *impossible* for the Does to do so. Defendants never informed parents in the district that students would be excused after just two hours of instruction during the last week of school. The Does were entitled to rely on Defendants to supervise JD while acting as his custodian and to expect that JD would be accounted for in Defendants' care.

It is reasonable to infer that the Does placed restrictions on JD's activity when he travelled to and from school, when he was at home, and in other situations—but not while JD was at school—because the Does believed the school policies already managed the risk that JD could engage in pre-marital sex. *See* Complaint, ¶ 41. Put another way, the Does took

9

significant steps to close off all potential windows of opportunity. Under the official attendance policies, there were no windows of opportunity during normal school hours that needed to be closed off. *See id.* ¶¶ 56–60. But the adopted attendance customs thwarted the Does' efforts, demanded by their religion, to ensure that JD did not engage in pre-marital sex. Defendants likewise interfered with JD's ability to uphold his religious beliefs by avoiding windows of opportunity in which he could engage in pre-marital sex with his girlfriend. Like the parolee in *Janny*, Plaintiffs effectively had no choice but to comply with the adopted attendance policies—which required conduct contrary to their religious beliefs. That is the compulsion prohibited by the Free Exercise Clause.

Defendants argue that "Skyridge's actions imposed no burden on JD's religious beliefs." Motion, p.9. This mischaracterizes Plaintiffs' allegations in several respects. First, Defendants incorrectly frame Plaintiffs' free exercise claims solely in terms of JD's religious freedom rights. *Id.* The Complaint alleges violations of "[t]he Does' and JD's fundamental right to practice and uphold their religious beliefs," and "the Does' and JD's ability to practice and attain the full enjoyment of their religion." Complaint, ¶¶ 55, 69. The Does' free exercise claim is distinct from JD's free exercise claim. *See Coble v. Lake Norman Charter Sch., Inc.*, 499 F. Supp. 3d 238, 244 (W.D.N.C. 2020).

Second, Defendants seem to argue that, at worst, the adopted attendance policies "opened a window of opportunity for JD" to engage in conduct that "violate[d] his family's religious beliefs." Motion, p.9. Defendants fail to recognize that such a window of opportunity was precisely what the Does, and JD, were religiously obligated to avoid.

Third, Defendants contend that because "Skyridge did not coerce JD to have sex with his girlfriend," there was no burden on JD's free exercise rights. Motion, p.9. But Plaintiffs have alleged that Defendants lost custody of, and thus deprived the Does' of their right to direct the religious upbringing of, JD during normal school hours as a result of the adopted attendance customs. *See* Complaint, ¶¶ 55, 64–66. The adopted attendance customs themselves were compulsory in that Plaintiffs had no choice but to comply. Defendants excused JD, along with all the other students, after only two hours of instruction. *Id.* ¶ 30. Skyridge did not account for students after that point. JD could not remain in class, because students were turned out from their classes; the Does could not retake custody of JD or take steps to close off additional windows of opportunity, because they were unaware that Defendants had dismissed students early, in violation of official school policies.

The constitutional violation here is easily distinguishable from the cases Defendants rely on. In *Parker v. Hurley*, three students alleged the school violated their free exercise rights after they were presented with books depicting same-sex relationships. 514 F.3d at 90. The First Circuit affirmed the dismissal of their claims, explaining that the Free Exercise Clause does not give students the right to be shielded from exposure to "ideas which potentially are religiously offensive." *Id.* at 106. Defendants contend that Plaintiffs similarly have no free exercise "right to enforcement of policies that facilitate a family's preferred religious practices at school." But that is not Plaintiffs' contention. The plaintiffs in *Parker* found the books at issue "religiously repugnant" but did not claim that being exposed to the books, or even listening to the books, violated a religious duty. By contrast, Plaintiffs have alleged that the adopted attendance customs opened a window of opportunity for JD—which itself violated religious duties of both

11

the Does and JD.  And unlike the plaintiff in *Bauchman*, who was given the option of not participating in choir songs and performances she found religiously objectionable, Plaintiffs here were not given a chance to refuse engaging in conduct contrary to their religious beliefs.  Despite Defendants' assertions to the contrary, Plaintiffs have properly alleged a free exercise claim in their Complaint.

### III. Plaintiffs Have Sufficiently Pleaded Claims Triggering The Hybrid Rights Exception.

The Does have adequately alleged deprivations of both their free exercise right and their right to parent, triggering heightened scrutiny of both claims.  The Does' fundamental right to direct JD's religious upbringing and education encompasses their right to insist that Defendants enforce the official attendance policies while JD is in Defendants' custody.  When the Does' parental rights claim is considered alongside their free exercise claim, both are entitled to strict scrutiny.  "Neutral rules of general applicability ordinarily do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief."  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004) (footnote omitted) (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) and *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990)).  Such rules are generally subject to rational basis review and will "survive a constitutional challenge if [they are] at least 'rationally related to a legitimate government interest.'"  *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) (quoting *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1232 (10th Cir. 2013)).  The Tenth Circuit, however, has "recognized the hybrid-rights free exercise theory discussed in [*Employment Division v.*] *Smith*."  *Axson-Flynn*, 356 F.3d at 1295 (referencing Swanson, 135 F.3d 694).  Under the hybrid-rights exception, a plaintiff can "establish a violation of the free exercise clause

12

even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 655 (10th Cir. 2006); *see also Jane L. v. Bangerter*, 794 F. Supp. 1537, 1547 (D. Utah 1992) (explaining that a free exercise claim can "bar application of a neutral, generally applicable law to religiously motivated action" only if the plaintiff also "allege[s] a concomitant violation of another constitutional protection").

For example, the Supreme Court has held that "when the interests of parenthood are combined with a free exercise claim, . . . more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972); *see also Jensen v. Reeves*, 45 F.Supp.2d 1265, 1274 (D. Utah 1999) (noting that "when a claim for violation of the parental right to control the upbringing and education of their child is coupled with a free exercise of religion claim, the rational basis test cannot be used"). In such cases, "heightened scrutiny may be appropriate." *Axson-Flynn*, 356 F.3d at 1295. But a plaintiff cannot "force the government to demonstrate the presence of a compelling state interest" merely by bringing a parental rights claim alongside a free exercise claim. *Swanson*, 135 F.3d at 700. To trigger application of the hybrid-rights exception, a plaintiff must make a "colorable showing of infringement of recognized and specific constitutional rights." *Id.* This requires the plaintiff to "show a fair probability or likelihood, but not a certitude, of success on the merits." *Axson-Flynn*, 356 F.3d at 1297.

Here, based on the facts alleged in the Complaint, the Does have shown a fair probability of success on the merits of their parental rights claim and their free exercise claim. The two rights are frequently asserted together because "[o]ne aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children." *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 684 (7th Cir. 1994) (citing *Yoder*, 406 U.S. 205); *see also Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-837, 2022 WL 15523185, at *26 (W.D. Pa. Oct. 27, 2022) (noting that parents' free exercise and parental rights claims were "intertwined"); *Parker v. Hurley*, 514 F.3d 87, 98 n.1 (1st Cir. 2008) (explaining that "parental rights and the free exercise of religion by parents are interests that overlap and inform each other, and thus are sensibly considered together"). The Complaint alleges that the Does objected to JD's involvement in pre-marital sex on both religious and secular grounds. Complaint, ¶¶ 39–40. And, as discussed, the Does undertook efforts to manage the risk that JD would further engage in pre-marital sex, in part because their religious obligations as parents required them to do so. Through their attendance customs to flout attendance policies, Defendants deprived the Does of their right to freely exercise their religion *and* their right to raise JD under the influence of their chosen religious beliefs. The Does have stated a colorable parental rights claim and a free exercise claim—triggering strict scrutiny of both.

**IV.     The Utah Governmental Immunity Act Does Not Immunize Defendants For Their Negligent Conduct.**

The Governmental Immunity Act does not bar Plaintiffs' claim that Defendants losing custody of JD during school hours was negligent. In the Motion, Defendants argue the Governmental Immunity Act of Utah (the "GIA") bars Plaintiffs' negligence claim. However, nothing in the Complaint establishes the applicability of the GIA as a matter of law.

The GIA permits a negligence claim against Defendant under Utah Code Ann. § 63G-7-201(1).  "Determining whether a government entity's action is immune from suit requires a three-step analysis:  first, we must determine whether the activity performed was a government function; second, if so, we must determine whether the Act waives immunity for that conduct; and third, if immunity is waived, we must determine whether the Act contains any exception to that waiver that would result in a retention of immunity." *Bingham v. Roosevelt City Corp.*, 235 P.3d 730, 742 (Utah 2010).  The first element is satisfied because Defendants are a Utah governmental entity and its employees as defined by Utah Code Ann. § 63G-7-102(3), (4). *See also Ledfors v. Emery Cnty. Sch. Dist.*, 849 P.2d 1162, 1165 (Utah 1993) (holding that "operation of a public school is a governmental function under" the GIA).

The GIA waives immunity for Plaintiffs' negligence claim.  The "question of immunity under the [GIA] focuses on the conduct out of which the injury arose rather than the theory of liability argued by a plaintiff." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1323 (10th Cir. 2009).  The GIA waives immunity for "any injury proximately caused by a negligent act or omission of an employee." Utah Code Ann. § 63G-7-301(2)(i).

There is an exception to the negligence provision, under which the state retains immunity, if an injury proximately caused by an employee's negligence "arises out of or in connection with, or results, from . . . infliction of mental anguish." *Id.* § 63G-7-201(4).  "In short, the Act retains immunity for government employees whose negligent acts or omissions inflict mental anguish." *Shively v. Utah Valley Univ.*, 2022 WL 1021614, at *5 (10th Cir. 2022).  Defendants argue this exception applies because Plaintiffs have alleged injuries that "arise out of

15

or in connection with the infliction of mental anguish." Motion, p.15. This mischaracterizes Plaintiffs' allegations.

As set forth in Plaintiffs' Complaint, Plaintiffs were injured by Defendants' negligence in losing custody of JD. The Complaint specifically states that Plaintiffs' injuries consist of the deprivation of the Does' right to parent and JD's engagement in pre-marital sex during school hours. The injuries from this conduct are distinct from merely mental anguish. Defendants claim they are immune under the GIA because JD's alleged injury is "severe emotional distress," and the Does' injuries "are emotional in nature"—an assumption they make because "Plaintiffs collectively have sought counseling 'to treat and remedy' their injuries." Motion, p.15 (quoting Complaint ¶¶ 94–97, 98). That counseling sessions have been required to treat these injuries does not lead to the conclusion that the injuries resulted from infliction of mental anguish. *Shively v. Utah Valley University*, is illustrative of the GIA's application to emotional distress claims. 2022 WL 1021614, at *1. There, the plaintiffs claimed a university professor committed suicide after school administrators "relied on baseless allegations to initiate a sham investigation into" him, despite learning the investigation caused the professor "extreme emotional distress." *Id.* at *5. The Tenth Circuit explained that the injury—the professor's emotional distress and eventual death—arose out of the administrators' conduct—infliction of mental anguish during the investigation. *Id.* The GIA therefore barred the plaintiffs' claims.

To draw a comparison, in the context of 42 U.S.C. § 1983, courts carve out exceptions to immunity based on emotional distress *resulting from* a constitutional violation, which is the actual injury, where such damages can be objectively shown independent of presumption or mere testimony. *See Carey v. Piphus*, 435 U.S. 247, 262–263 (1978). To determine if courts should

sustain an award for emotional distress damages stemming from a constitutional violation, one of the factors that courts consider is whether the claimant sought psychiatric counseling. *See, e.g.*, *Fitzgerald v. v. Mountain States Telephone and Telegraph Co.*, 68 F.3d 1257, 1265–66 (10th Cir. 1995) (considering whether a claimant sought counseling in review of an award of compensatory damages for emotional distress stemming from a constitutional violation); *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1254 (4th Cir. 1996) (same); *Spence v. Bd. of Educ. of Cristina Sch.* 806 F.2d 1198, 1201 (1986) (same).

Here, by contrast to the claims in *Shively*, Plaintiffs' injuries stemming from the Defendants' negligence are not merely emotional distress, but constitutional deprivations. The mental anguish then flows from the constitutional deprivation, and are a a part of the damages claimed. Furthermore, the damages claimed are objectively quantifiable costs associated with counseling. JD's engagement in sexual activity, against the wishes of his parents and covenants of his religion—to which, as a minor, he could not consent to as a matter of law—arise out of Defendants' adopted attendance customs that resulted in Defendants losing custody of JD. Therefore, because the actual injury is a constitutional deprivation rather than merely emotional distress, Plaintiffs' allegations do not fall under the "infliction of mental anguish" exception to the GIA. As such, the Complaint does not establish that Defendants are entitled to immunity under the GIA for their negligent conduct.

## CONCLUSION

Plaintiffs have stated claims for relief. Defendants' arguments to the contrary are without merit. The Court should deny Defendants' Motion to Dismiss and allow the case to proceed.

DATED this 28th day of November 2022.

                                    **MITCHELL BARLOW & MANSFIELD, P.C.**

                                    */s/ Robert E. Mansfield*
                                    Robert E. Mansfield
                                    Megan E. Garrett
                                    *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of November, 2022, I caused a true and correct copy of the foregoing **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** to be filed on the Court's electronic filing system, which effectuated service of the same upon the following:

>Darin B. Goff
>Bradley R. Blackham
>Assistant Utah Attorney General
>SEAN D. REYES
>Utah Attorney General
>160 East 300 South, 6th Floor
>PO Box 140856
>Salt Lake City, Utah 84114
>dgoff@agutah.gov
>bblackham@agutah.gov

*/s/ Cassie Thompson*